TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00772-CV







Graff Chevrolet Company, Inc., Appellant


v.



The Texas Motor Vehicle Board; North Arlington Automotive L.P., d/b/a Performance
Chevrolet; and General Motors Corp., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. GN0-00537, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





 Appellee North Arlington Automotive, L.P., doing business as Performance Chevrolet
(Performance), applied to the Motor Vehicle Board of the Texas Department of Transportation (the
Board) to establish a new Chevrolet dealership in Arlington. Appellant Graff Chevrolet Company,
Inc. (Graff), a Chevrolet dealer located in Grand Prairie, protested Performance's application. After
the protest hearing, the administrative law judge (ALJ) issued a proposal for decision recommending
denial of Graff's protest. The Board unanimously adopted the ALJ's proposal for decision, findings
of fact, and conclusions of law. The Board denied Graff's motion for rehearing.

 Graff sought judicial review of the Board's denial of the protest before the district
court, which affirmed the Board's order. Graff appeals to this Court, arguing that the lower court's
judgment affirming the Board's order violated Graff's right to due process, that the Board incorrectly
examined the issue of "public interest" during the protest hearing, and that the lower court erred in
denying Graff's request for remand. Because we conclude that there is substantial evidence to
support the Board's decision, we will affirm the trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 In 1996, Vandergriff Chevrolet (Vandergriff) completed relocation from its long-time
home in north Arlington to a site along the Interstate 20 corridor in south Arlington. Vandergriff had
been located in north Arlington for six decades, and its relocation left a vacancy in Chevrolet's
representation in north Arlington. General Motors (GM) planned to re-establish another Chevrolet
dealership following Vandergriff's relocation and acquired property in north Arlington to house the
new dealership. The new dealership point is located adjacent to Interstate 30 and is within a few
hundred yards of several rival automotive dealerships. All Chevrolet dealerships in the area
surrounding the new point with standing to protest the establishment of the new dealership signed
a letter supporting the new point, including Graff. Al Graff, the father of current Graff owner Stan
Graff, signed the letter, but his son did not. Al Graff subsequently applied for the new dealership. 
GM considered Al Graff and other dealers for the new dealership point, but instead selected and
approved A.C. Croom, who had been involved in the automotive industry since 1986. Al Graff
passed away in April 1997, leaving his son, Stan, in charge of the Graff dealership.

 Croom filed an application with the Motor Vehicle Board for a new motor vehicle
dealer license in May 1997 for a Performance Chevrolet dealership to be located at the new point
in north Arlington. Graff filed a protest in June 1997, and GM filed a plea for intervention later that
summer. In a protest proceeding, the applicant must show good cause for establishing the new
dealership, or the Board may deny the application. Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 4.06(c)
(West Supp. 2001). The Board will consider five factors in determining whether there is good cause:
(1) the adequacy of the manufacturer's or distributor's representation, (2) the protesting dealer's
compliance with its franchise agreement, (3) the desirability of a competitive marketplace, (4) harm
to the protesting dealer, and (5) the public interest. Id. In the protest proceeding between Graff and
Performance, both parties agreed that Graff complied with its franchise agreement, see id., leaving
the other four factors for the Board's consideration. 

 The ALJ conducted the protest hearing and heard evidence from all parties regarding
the four remaining factors. Performance and GM presented evidence in the form of empirical data
and expert testimony showing that the market will support the new Performance dealership, and
Graff presented evidence that it will not. Dr. George W. Berry testified on behalf of Performance
that there is an expected nominal growth in population and a substantial increase in the level of
business activity and employment in Arlington and AGSSA 1, (1) where the new point is located. 
GM's expert witness, James Anderson, testified that there is a historical increase in the driving-age
population in the area that is likely to continue. Graff's expert witness, Dr. Bernard L. Weinstein,
agreed with many demographic assertions made by Dr. Berry but also offered testimony that certain
boundaries, such as freeways and the Trinity River Basin, limit the actual geographic "advantage"
attributable to the new point. The ALJ agreed with Performance and GM that Arlington, and
specifically AGSSA 1, is a growing area with a positive economic future.

 Additionally, Graff offered testimony that the area immediately surrounding the Graff
dealership in Grand Prairie is in poor economic condition and will inevitably cause Graff to go out
of business. Dr. Weinstein testified that the population in downtown Grand Prairie has been
declining since 1990, that about seventy-five percent of households within a one-mile radius of the
dealership have annual incomes of less than $50,000, and that unemployment is around 9.7 percent
within a two-mile radius of the dealership. Nonetheless, the ALJ determined that the overall
unemployment rate in Grand Prairie is 4.2 percent, which is equal to the regional average, and that
major retailers such as Target and Home Depot had recently relocated to south Grand Prairie, which
demonstrates economic viability, not economic decline. Additionally, the ALJ noted that despite
the dire economic findings Graff offered, Grand Prairie's uncertain economic status does not
correlate with Graff's financial performance. Between 1992 and 1997, Graff's retail sales increased
fifty-three percent, and profits for the same time period increased eighty-nine percent. The ALJ also
observed that a "good portion" of Graff's new vehicle registrations in 1996 were within a two-mile
radius of the dealership and that Graff's core market encompassed an area within a twenty-mile
radius of the dealership, demonstrating that Graff is not seriously limited by its immediate
surroundings in downtown Grand Prairie. 


Adequate Representation

 Performance, GM, and Graff offered evidence regarding the adequacy of Chevrolet's
representation in the Fort Worth area in accordance with section 4.06(c)(1). See id. § 4.06(c)(1). 
Performance and GM pointed out that Ford, Chevrolet's primary competitor, has eleven dealerships
in the Fort Worth area, including two in Arlington. Chevrolet has only nine dealerships in the area,
including Vandergriff in Arlington. Additionally, Anderson provided data outlining Chevrolet's
penetration rate in Texas, the greater Fort Worth area, the Fort Worth MDA, (2) and AGSSA 1 from
1994 to June 1997. This data showed that Chevrolet's penetration in AGSSA 1 was significantly
below the state and area averages. Graff's expert argued that the use of the statewide penetration rate
was improper because that standard is skewed by rural dealerships that face less interbrand
competition and have a stronger market for popular Chevrolet pickup trucks than urban dealerships. 
Anderson responded by pointing out that even after the Texas rate is segmented, (3) Chevrolet is still
not adequately represented in greater Fort Worth, the Fort Worth MDA, or AGSSA 1. Performance
and GM also established that Ford, whose Texas standard should also be skewed by rural
dealerships, was meeting and exceeding the Texas average penetration rate in Fort Worth. The ALJ
made a finding of fact that Chevrolet is not being adequately represented in greater Fort Worth, the
Fort Worth MDA, or AGSSA 1.


Harm to the Protesting Dealer

 Based on evidence presented at the protest hearing, the ALJ determined that the
proposed Performance dealership in north Arlington will not significantly harm Graff. Graff
contended that the dealership is on the brink of economic failure and if it were forced to compete
with the new Performance dealership, Graff would have to shut down. The ALJ found that this
argument was not supported by the facts, which show that Graff has been financially successful in
the past and likely will continue to be in the future. First, Graff successfully competed with
Vandergriff when it was in north Arlington. The new point is essentially the re-establishment of a
north Arlington dealer, and should not pose an especially different economic threat than the
Vandergriff dealership. Second, Graff has increased profits over the past several years even as it
reduced advertising costs. Graff spent $315,000 in new vehicle advertising and made an average
gross profit per vehicle of $1,500 in 1992; in 1997, Graff spent only $110,937 in new car advertising
and made an average gross profit per vehicle of $1,547. Additionally, Graff spends $120 per unit
in advertising costs even though other dealerships in the area spend about $307 per unit in
advertising costs. Thus, Graff has the financial flexibility to adapt its advertising budget to compete
with a north Arlington dealership. Third, Al Graff, a successful businessman, gave serious
consideration to the prospect of applying for the new point and maintaining or selling the Graff
dealership in Grand Prairie, which shows that he anticipated that the Graff dealership would continue
to have value even after the re-establishment of the north Arlington dealership. The ALJ found that
this evidence showed that the north Arlington dealership will not cause substantial harm to Graff. 

 Alternatively, Graff argued that there is not enough business to support both
dealerships, so even if Graff were successful, Performance would not be. Performance and GM
presented evidence to the contrary, asserting that Performance may capture some of the "lost
opportunity" (4) sales in AGSSA 1. Anderson testified that Performance's capture of the lost
opportunity could provide sufficient sales to meet or exceed Chevrolet dealer standards without
treading upon Graff's customer base. The ALJ found that the evidence supported a finding that the
establishment of Performance in north Arlington carries no real prospect of significant harm to Graff.


Desirability of a Competitive Marketplace

 The ALJ found that the establishment of Performance in north Arlington would
promote a competitive marketplace based on evidence presented by Performance and GM that a
north Arlington dealership will renew Chevrolet's presence in AGSSA 1 and provide customers with
more convenience and choice in dealerships. Graff counters this argument, stating that the new
dealership will not promote competition because the market for Chevrolet products is saturated. The
ALJ found that Graff's assertion lacked corroboration and determined that the new dealership will
provide more customer service and convenience and will promote a competitive marketplace.


Public Interest

 The evidence Performance and GM presented to show that the new dealership will
be in the public interest outweighed the arguments Graff presented, in the ALJ's judgment, and the
ALJ correspondingly found that the establishment of the Performance dealership is in the public
interest. Graff argued that Graff was denied fair consideration for the new point because the point
was a designated "minority point," and thus Croom, as an African-American, was given unfair
consideration. Alternatively, Graff posited that Croom is not financially qualified and lacks the
necessary qualifications and experience to run a dealership. The ALJ found that there was very little
credible evidence to support the assertion that the north Arlington site was a designated "minority
point," and that Graff's other arguments were based on the factors in section 4.02(a) of the Motor
Vehicle Code. See Act of May 16, 1995, 74th Leg., R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887,
2891 (Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 4.02(a), since amended). The ALJ found Graff's
attacks on Croom's qualifications under section 4.02(a) to be irrelevant based on this Court's
decision in Gene Hamon Ford, Inc. v. David McDavid Nissan, Inc., 997 S.W.2d 298, 313 (Tex.
App.--Austin 1999, pet. denied). GM and Performance argued that the re-establishment of a north
Arlington dealership will be in the public interest because it will restore service to the residents of
north Arlington, will increase Chevrolet's visibility along the Interstate 30 corridor in Tarrant
County, will create new jobs, and will provide the community with a successful, minority-run
business. The ALJ determined that the evidence in favor of Performance outweighed the evidence
presented by Graff and entered its finding of fact that the new dealership will serve the public
interest.


DISCUSSION

 Graff raises seven issues in its appeal. Graff argues in part that the proposal for
decision adopted by the Board deprived Graff of due process and that the district court erred in not
granting Graff's request for remand. Graff's five remaining arguments hinge upon the Board's
examination of the public interest factor cited in section 4.06(c). See Tex. Rev. Civ. Stat. Ann. art.
4413(36), § 4.06(c). Additionally, the Board filed a motion to strike certain portions of Graff's brief
from the court's record.


Standard of Review

 This Court presumes that the Board's order is supported by substantial evidence, and
Graff has the burden to overcome this presumption. See Meier Infiniti Co. v. Motor Vehicle Bd., 918
S.W.2d 95, 98 (Tex. App.--Austin 1996, writ denied). The Administrative Procedure Act (APA)
authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to
determine whether they are reasonably supported by substantial evidence considering the reliable and
probative evidence in the record as a whole. Tex. Gov't Code Ann. § 2001.174(2)(E) (West 2000). 
The evidence in the record may preponderate against the decision of the agency and nevertheless
amount to substantial evidence. Meier, 918 S.W.2d at 98. The true test is not whether the agency
reached the correct conclusion but whether some reasonable basis exists in the record for the
agency's action. Id. We will sustain the agency's action if the evidence is such that reasonable
minds could have reached the conclusion that the agency must have reached in order to justify its
action. Id.


Due Process

 Graff contends that the ALJ's proposal for decision was improper because the
language in the decision reflected "zealous advocacy of a predetermined result." The language the
ALJ used to characterize Graff's evidence reflected not a predetermined bias but an opinion reached
after full consideration of the evidence presented in the hearing. Graff's assertion misconstrues the
purpose of a proposal for decision which must recommend a result and contain "a statement of the
reasons for the proposed decision and of each finding of fact and conclusion of law necessary to the
proposed decision." Tex. Gov't Code Ann. § 2001.062(c) (West 2000). A proposal for decision is
not supposed to be a neutral, detailed reflection of the record, but a summary of the presented
evidence and the ALJ's recommendation regarding the just result of the dispute. The ALJ's proposal
for decision reflected the ALJ's determination of the evidence in accordance with section
2001.062(c) of the Government Code. See id. We overrule Graff's first point of error.


Public Interest

 According to section 4.06(c) of the Motor Vehicle Code, the Board must make an
ultimate finding of good cause before granting a license to an applicant for a new motor vehicle
dealership when the application has been protested by an existing dealer. Tex. Rev. Civ. Stat. Ann.
art. 4413(36), § 4.06(c). That section sets out five criteria that must be considered in the Board's
determination of good cause:


(1) whether the manufacturer or distributor of the same line-make of new motor
vehicle is being adequately represented as to sales and service;


(2) whether the protesting franchised dealer representing the same line-make of new
motor vehicle is in substantial compliance with his franchise agreement, to the
extent that the franchise agreement is not in conflict with this Act;


(3) the desirability of a competitive marketplace; 


(4) any harm to the protesting franchised dealer; and 


(5) the public interest.



Id. Graff's complaint focuses on the public interest factor. Graff argues that to be meaningful, the
public interest factor must encompass something other than the other four elements comprising good
cause. Graff asserts that public interest must therefore include economic fitness and the other
licensing qualifications listed under section 4.02(a). See Act of May 16, 1995, 74th Leg., R.S., ch.
357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 4.02(a), since
amended). (5) 

 Graff's attempts to challenge Croom's economic fitness to serve as a dealer have been
foreclosed by our decision in Hamon. See Hamon, 997 S.W.2d at 313. There, we upheld the
Board's reading of the statute that under section 4.06(c), a protestant such as Graff lacks standing
to raise the economic viability of the dealer it is challenging. Id. at 305-06. While Hamon involved
a challenge to the relocation of a dealership, the same principle applies in a proceeding under section
4.06(c) to challenge a new dealership:


Section 4.06(c), which governs protest proceedings, makes good cause the sole
inquiry in a protest proceeding; it contains no reference to any of the factors listed in
section 4.02(a) that McDavid labels the "economic viability" factors. Conversely,
nothing in section 4.02(a) suggests that a protestant is entitled to challenge an
applicant's satisfaction of that section's requirements. To read the [Motor Vehicle]
Code in such a way would effectively allow protestants to assume the Board's
responsibilities.



Id. at 306. The factors in section 4.02(a) have already been considered by the Board in its
determination to grant Croom's application for a dealership and may not be second-guessed by Graff
in his protest proceeding.

 In Hamon, we held that the only inquiry in a protest proceeding is good cause. Id.
at 313. Graff seeks to avoid our ruling by importing economic factors into the definition of public
interest, one of the five elements of good cause. He argues that public interest must mean something
more than the sum of the other four elements of good cause. While the Board may consider other
factors in determining what is in the public interest, under our holding in Hamon, it may not consider
the economic factors listed in section 4.02(a). See id. at 306. Graff does not have standing to raise
questions about Croom's economic fitness as a dealer.

 Graff responds that if Hamon means that the public interest element of good cause
does not include economic fitness of the challenged dealer and if it means that he does not have
standing to raise such issues in a protest proceeding, then Hamon goes too far and needs to be
revisited. That is how we read Hamon, and we decline to revisit that holding for the reasons we have
expressed. Nothing in section 4.02(a) grants a protestant the right to challenge the Board's decision
to grant an application for a dealership, and nothing in section 4.06(c) suggests that the economic
fitness of the dealer in question is a factor when a protesting dealer asks the Board to determine if
there is good cause to create or relocate a dealership. See Act of May 16, 1995, 74th Leg., R.S., ch.
357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 4.02(a), since
amended); Tex. Rev. Civ. Stat. Ann. art. 4413(36), § 4.06(c). We reject Graff's proposal that the
public interest element of good cause must include consideration of the economic fitness of the
dealer. We turn, then, to Graff's complaint that the Board's decision on the public interest factor
was not supported by substantial evidence. 

 The Board points out that the establishment of Performance Chevrolet will, among
other things, enhance competition between Chevrolet and its rivals, create new jobs, and provide a
successful minority-run dealership in the community. These factors all pertain to the public interest,
and the Board's determination that the new dealership will serve the public interest was supported
by substantial evidence.

 Graff offers three reasons to reverse the Board's finding that a new dealership will
serve the public interest: that there was a "more viable alternative" for the new dealership (namely,
Graff itself), that Croom is not qualified to be a dealer, and that the parties involved in the dealer
selection process were "improperly motivated." These three issues have no practical bearing on a
substantial evidence review of a section 4.06(c) protest proceeding. Even though there may exist
a more viable alternative for the new point, that does not preclude a finding that there was substantial
evidence to support the Board's approval of Performance, given that the evidence may preponderate
against the Board's decision and still amount to substantial evidence. See Hamon, 997 S.W.2d at
306. Croom's qualifications to be a new motor vehicle dealer fall under section 4.02(a) and are
subject to examination in the initial licensing application and not in a protest proceeding. (6) See id. 
Finally, the Board found no evidence that any of the parties involved in the dealer selection process
were not properly motivated. Graff intimated that GM's reasons for choosing Croom for the new
dealership were not based on normal business considerations, but Graff provided no evidence to
support that assertion during the protest hearing. The ALJ determined that the evidence showed no
wrongdoing on the part of Croom or his financial backers and that selecting Croom as dealer-operator for the new point is not contrary to the public interest. In conducting a substantial evidence
review, this Court may not substitute its judgment for those findings of the Board that have
substantial support in the evidence. See Tex. State Bd. of Dental Exam'rs v. Sizemore, 759 S.W.2d
114, 116 (Tex. 1988).

 We conclude that the Board properly considered the public interest factor in
determining good cause under section 4.06(c). Accordingly, we overrule Graff's second, third,
fourth, fifth, and sixth points of error.


Remand Issue

 Section 2001.175(c) of the Texas Government Code states that the court may remand
a case to the state agency if the court is satisfied that the additional evidence presented is material
and that there were good reasons for the failure to present it in the proceeding before the ALJ. Tex.
Gov't Code Ann. § 2001.175(c) (West 2000). Graff conceded during oral argument that if we do
not adopt its proposed definition of public interest, there is no reason to remand this case for further
consideration by the Board. Because of our holding, we overrule the request for a remand.


Motion to Strike

 We overrule the Board's motion to strike the six proposals for decision that Graff
included in its brief, but note that consideration of those proposals is irrelevant to the outcome of this
case in light of Hamon.

CONCLUSION

 Our holding in Hamon precludes Graff's attempts to raise the economic fitness of
Croom in this protest proceeding. Nor does the definition of public interest, one element of good
cause, put into issue the economic viability of the challenged dealer. We overrule Graff's due
process issue and find that substantial evidence supports the Board's determination of good cause
to establish a new dealership at this point. We therefore affirm the district court's judgment and the
order of the Board. 



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: June 14, 2001

Publish

1. AGSSA is an acronym for "Area of Geographic Sales and Service Advantage." Selected
census tracts immediately surrounding each dealership make up each AGSSA, the area in which the
dealer has a competitive advantage over other neighboring dealers. The new dealership point is
located in AGSSA 1, and Graff is located in AGSSA 110.
2. MDA is an acronym for "Multiple Dealer Area," which is an area of responsibility
assigned by a manufacturer to two or more of its dealers on a shared basis. Two or more AGSSAs
make up an MDA.
3. Segmentation is a process in which the chosen standard is adjusted to account for
differences in product preferences from market to market. 
4. "Lost opportunity" is used in this context to refer to lost sales resulting from "insell." 
Insell in this case is the sale of Chevrolet vehicles to residents of AGSSA 1 from dealers located
outside the Fort Worth and Dallas MDAs.
5. Section 4.02(a) sets out the criteria the Board "considers necessary to determine an
applicant's qualifications to adequately serve the motoring public," including "the applicant's
financial resources, business integrity, business ability and experience, franchise agreement if
applicable, physical facilities, vehicle inventory, and other factors." Act of May 16, 1995, 74th Leg.,
R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex. Rev. Civ. Stat. Ann. art. 4413(36),
§ 4.02(a), since amended). 
6. Additionally, Graff asserts that there was not substantial evidence to support the Board's
finding that Performance's license application was in the public interest because, Graff argues,
Croom is not financially qualified to be a dealer and lacks the requisite dealer experience. These
assertions, if true, do not negate the many facts the Board found that characterize Croom as a
potentially successful dealer and do not merit a finding that the Board's decision did not stem from
a reasonable basis. 


 sixth points of error.


Remand Issue

 Section 2001.175(c) of the Texas Government Code states that the court may remand
a case to the state agency if the court is satisfied that the additional evidence presented is material
and that there were good reasons for the failure to present it in the proceeding before the ALJ. Tex.
Gov't Code Ann. § 2001.175(c) (West 2000). Graff conceded during oral argument that if we do
not adopt its proposed definition of public interest, there is no reason to remand this case for further
consideration by the Board. Because of our holding, we overrule the request for a remand.


Motion to Strike

 We overrule the Board's motion to strike the six proposals for decision that Graff
included in its brief, but note that consideration of those proposals is irrelevant to the outcome of this
case in light of Hamon.

CONCLUSION

 Our holding in Hamon precludes Graff's attempts to raise the economic fitness of
Croom in this protest proceeding. Nor does the definition of public interest, one element of good
cause, put into issue the economic viability of the challenged dealer. We overrule Graff's due
process issue and find that substantial evidence supports the Board's determination of good cause
to establish a new dealership at this point. We therefore affirm the district court's judgment and the
order of the Board. 



 

 Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: June 14, 2001

Publish

1. AGSSA is an acronym for "Area of Geographic Sales and Service Advantage." Selected
census tracts immediately surrounding each dealership make up each AGSSA, the area in which the
dealer has a competitive advantage over other neighboring dealers. The new dealership point is
located in AGSSA 1, and Graff is located in AGSSA 110.
2. MDA is an acronym for "Multiple Dealer Area," which is an area of responsibility
assigned by a manufacturer to two or more of its dealers on a shared basis. Two or more AGSSAs
make up an MDA.
3. Segmentation is a process in which the chosen standard is adjusted to account for
differences in product preferences from market to market. 
4. "Lost opportunity" is used in this context to refer to lost sales resulting from "insell." 
Insell in this case is the sale of Chevrolet vehicles to residents of AGSSA 1 from dealers located
outside the Fort Worth and Dallas MDAs.
5. Section 4.02(a) sets out the criteria the Board "considers necessary to determine an
applicant's qualifications to adequately serve the motoring public," including "the applicant's
financial resources, business integrity, business ability and experience, franchise agreement if
applicable, physical facilities, vehicle inventory, and other factors." Act of May 16, 1995, 74th Leg.,
R.S., ch. 357, § 9, 1995 Tex. Gen. Laws 2887, 2891 (Tex. Rev. Civ. Stat. Ann. art. 4413(36),
§ 4.02(a), since amended). 
6. Additionally, Graff asserts that there was not substantial evidence to support the Board's
finding that Performance's license application was in the public interest because, Graff argues,
Croom is not financially qualified to be a dealer and lacks the requisite dealer experience. These
assertions, if true, do not negate the many facts the Board found that characterize Croom as a
potentially successful dealer and do not merit a finding that the Board's decision did not stem from
a reasonable basis. 


 sixth points of error.


Remand Issue

 Section 2001.175(c) of the Texas Government Code states that the court may remand
a case to the state agency if the court is satisfied that the additional evidence presented is material
and that there were good reasons for the failure to present it in the proceeding before the ALJ. Tex.
Gov't Code Ann. § 2001.175(c) (West 2000). Graff conceded during oral argument that if we do
not adopt its proposed definition of public interest, there is no reason to remand this case for further
consideration by the Board. Because of our holding, we overrule the request for a remand.


Motion to Strike

 We overrule the Board's motion to strike the six proposals for decision that Graff
included in its brief, but note that consideration of those proposals is irrelevant to the outcome of this
case in light of Hamon.

CONCLUSION